AO 91 (Rev. 11/11) Criminal Complaint

AUSA Kristen Viglione (312) 353-5340

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

**FILED**

JUN 21 2017

*LCW*

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA

v.

DEENADAYAL  GADDAM

CASE NUMBER:

**17CR   433**

**CRIMINAL COMPLAINT** MAGISTRATE JUDGE MARTIN

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

### COUNT ONE

On or about April 5, 2017, at Chicago, in the Northern District of Illinois, Eastern Division, DEENADAYAL  GADDAM, defendant herein, knowingly and willfully solicited and received a kickback directly, covertly, in cash in return for referring an individual(s) to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

### COUNT TWO

On or about April 26, 2017, at Chicago, in the Northern District of Illinois, Eastern Division, DEENADAYAL  GADDAM, defendant herein, knowingly and willfully solicited and received a kickback directly, covertly, in cash in return for referring an individual(s) to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

### COUNT THREE

On or about May 24, 2017, at Chicago, in the Northern District of Illinois, Eastern Division, DEENADAYAL  GADDAM, defendant herein, knowingly and willfully solicited and received a kickback directly, covertly, in cash in return for referring an individual(s) to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

## COUNT FOUR

On or about June 14, 2017, at Chicago, in the Northern District of Illinois, Eastern Division, DEENADAYAL GADDAM, defendant herein, knowingly and willfully solicited and received a kickback directly, covertly, in cash in return for referring an individual(s) to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

This criminal complaint is based upon these facts:

 X  Continued on the attached sheet.

_____

ELLIOT ROTHROCK
Special Agent, Federal Bureau of Investigation
(FBI)

Sworn to before me and signed in my presence.

Date: June 21, 2017                        _____
                                                          *Judge's signature*

City and state: Chicago, Illinois          DANIEL G. MARTIN, U.S. Magistrate Judge
                                                          *Printed name and Title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

ss

## **AFFIDAVIT**

I, ELLIOT ROTHROCK, being duly sworn, state as follows:

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been since 2009.  I am currently assigned to the Health Care Fraud Program, the primary purpose of which is to identify and investigate the activities of persons suspected of defrauding Government and private health care programs.  As such, I have received specialized training and participated in numerous health care fraud investigations, which have involved conducting search warrants, reviewing records, consensual recordings, physical and video surveillance, and interviewing witnesses, informants, and others who have knowledge of fraud perpetrated against Medicare. Through my training, education, and experience, I have become familiar with the manner in which healthcare programs are defrauded through misrepresentations submitted to Medicare and other medical benefits providers. I have also become familiar with the practice of businesses paying kickbacks to physicians and others in exchange for the referral of Medicare patients. These patients are then often used as a means to defraud the Medicare program through the submission of false claims.

2.      This affidavit is submitted in support of a criminal complaint alleging that DEENADAYAL GADDAM has violated Title 42, United States Code, 1320a-7b(1)(A) (the Federal Anti-kickback statute).   Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a

criminal complaint charging GADDAM with accepting illegal kickbacks, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

3.     This affidavit is based on my personal knowledge, information provided to me by other law enforcement personnel, law enforcement records, other government records, confidential sources, and undercover recordings. To the extent that consensually recorded communications are summarized below, the summaries do not necessarily include references to all topics covered in the recorded conversation, nor do they include references to all statements made by the speakers on the topics that are described. All quotations from recorded conversations are based upon preliminary transcriptions of those conversations and/or from your affiant having personally listened to the recordings. In addition, the participants in many of these communications may have used slang terms and code words. Those code words and slang terms, as well as communications in general, are interpreted in this Affidavit based upon (a) my training, experience and knowledge of this investigation, (b) other law enforcement officers' training, experience and knowledge of this investigation, and/or (c) other evidence gathered during the course of the investigation, such as physical surveillance and the review of records.

## STATUTORY BACKGROUND

### *The Federal Anti-Kickback Statute*

4.      Title 42, United States Code, Section 1320a-7b(b)(1)(A) prohibits health care providers, including doctors, from soliciting or receiving kickbacks in exchange for the referral of Medicare and Medicaid patients or other federally insured beneficiaries.  Specifically, the statute provides, in pertinent part:

    a.  Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—

    b.  In return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program. . .

    c.  Shall be guilty of a felony. . .

Under the federal anti-kickback statute, among other things, it is illegal to knowingly and willfully receive remuneration of any sort in exchange for the referral of a patient for home health care services for which payment may be made under Medicare or Medicaid.[1]  The purpose of the federal anti-kickback statute is to ensure that medical decisions are not influenced by financial rewards from third parties and to protect against increased costs to federal health care programs.

---

[1] Similarly, claims for items or services resulting from a violation of the anti-kickback statute are false claims for purposes of subchapter III of chapter 27 of Title 31.  *See* 42 U.S.C. § 1320a-7b(g).

**SUMMARY**

5.     The FBI and the U.S. Department of Health and Human Services Office of Inspector General (HHS-OIG), has been conducting an investigation into DEENADAYAL GADDAM, a Chicago-area physician who is receiving illegal kickbacks in exchange for referring patients to home health agencies. The illegal kickback scheme set forth below involves the referral of GADDAM's patients to a cooperating home health agency ("Company A") in exchange for cash payments, delivered in person by Cooperating Witness A ("CW-A").

6.     GADDAM's own statements and other evidence indicate that he also received illegal kickbacks from other agencies and has engaged in this practice generally since 1992.

**FACTS ESTABLISHING PROBABLE CAUSE**

***Background on GADDAM***

7.     GADDAM is a licensed physician and surgeon in Illinois, and has been since approximately March 23, 1992, according to publicly available records from the Illinois Department of Professional and Financial Regulation ("IDFPR").

8.     Publicly available information and consensual recordings with GADDAM indicate that he is affiliated with, and or practices at, three Chicago area hospitals. One of these hospitals ("Hospital A") is located on Chicago's West Side. GADDAM appears to maintain an office at Hospital A, which is primarily where CW-A met with GADDAM during his consensual recordings.

**Background on CW-A and Company A**

9.      CW-A is the spouse of the owner of Company A, and is not a medical professional by training or trade. CW-A has no known criminal history.   CW-A began cooperating with the government after GADDAM propositioned Company A, CW-A's wife's business.

10.      After GADDAM's proposition, CW-A spoke with a health care attorney. The attorney then connected CW-A with an agent who worked for HHS-OIG. On or about March 21, 2017, HHS-OIG agents interviewed CW-A, details of which will be provided later, and CW-A began cooperating with the government.

11.      CW-A has not received any compensation from law enforcement, but as part of CW-A's cooperation in the investigation, Company A has been authorized to provide services for the patients GADDAM refers, and bills Medicare for these services.

12.      A research body affiliated with Congress, that researches and provides advice to legislators on Medicare policy, estimated that the profit margins on episodes of home health were roughly 13.3% in 2014, which is the most recent year available. According to Medicare data available on May 31, 2017, Company A had not yet received any money from Medicare for the patients GADDAM referred to the business. However, it is likely that Company A will do so at some point.  Based on my experience and training, Company A would be paid roughly between $2,000 and $5,000 per home health episode, depending on the type and frequency of nursing visits and if any specialized therapies were provided to each patient.

13.     As of May 24, 2017, Company A had enrolled approximately 14 patients for initial episodes, and two of those patients were due to be recertified. That is a total of 16 episodes of home health, each reimbursable for roughly between $2,000 and $5,000, with the total potential Medicare reimbursements ranging anywhere from roughly $32,000 to $80,000. Applying the Congressional research body's estimated margins to these totals gives a potential profit margin for Company A of between $4,256 and $10,640 for the episodes it provided to GADDAM's patients.

### *Initial Interview of CW-A*

14.     On or about March 21, 2017, CW-A met with agents from HHS-OIG. During this interview CW-A told agents that Company A had hired a marketer, ("Individual A"), who previously worked at another home health agency ("Company B").[2] Company B was owned by a woman ("Individual B") who closed the business and transferred all of the patients and employees to another agency she owned ("Company C"). Individual B did so because her original business, Company B, got into some unspecified trouble. CW-A also claimed that Company C had since been suspended from the Medicare program for unknown reasons.

15.     Individual A knew employees of Company B and Company C from her

---

[2] CW-A admitted during his initial interview that Company A paid cash to marketers who provided Company A with patients from other home health agencies, which for whatever reason could not service these patients themselves. CW-A claimed the marketers Company A paid for these referrals were employees of these other home health agencies. CW-A also believed that all of the patients Company A received in this way were homebound, which is one of Medicare's requirements for reimbursing home health services.

time there, and learned from one of these people that GADDAM had previously referred patients to Company B. Individual A reached out to GADDAM, in her capacity as a marketer for Company A, on or about March 13, 2017, to set up a meeting about referring patients to Company A.

16. On or about March 13, 2017, CW-A's wife and Individual A went to meet with GADDAM. CW-A was not present for that meeting and did not provide much detail of what transpired. Another meeting was scheduled with GADDAM and CW-A's wife asked CW-A to attend as well.

17. On or about March 17, 2017, CW-A and CW-A's wife met with GADDAM at GADDAM's office in Hospital A. This meeting was not recorded and was prior to CW-A's active cooperation with the government. During the meeting, GADDAM claimed he was a "medical director" of Hospital A, while also practicing at a second hospital. According to CW-A, GADDAM asked CW-A if CW-A was recording the meeting and then wrote the phrases "SOC" and "Recert" along with "600" and "500" on a piece of paper. CW-A understood this to mean that GADDAM was soliciting payments of $600 per "start of care," which means the initial episode of home health for a patient and which are commonly abbreviated as "SOC," and $500 per recertification, which are subsequent episodes of home health for a patient and which are often colloquially known as "recerts."

18. According to CW-A, GADDAM then crossed these numbers out and wrote "500" and "300." CW-A understood this to mean that GADDAM was reducing the payment amounts he was soliciting to $500 per "start of care" and $300 per

recertification. GADDAM told CW-A he wanted the payments in cash after signing two copies of the CMS-485 form for each patient. The CMS-485 form colloquially is known as "the plan of care" and summarizes a patient's diagnoses, medications, and the services the home health agency intends to provide. A signed CMS-485 for each episode of home health is required to support a claim to Medicare.

19.     According to CW-A, GADDAM told them it was normal to be nervous about paying for referrals like this but attempted to assure them that it was happening "all over." GADDAM told CW-A to think over the offer, but CW-A told GADDAM during that meeting CW-A wanted to go forward with the arrangement and GADDAM acknowledged that CW-A would be meeting him in the future to hand over the cash payments.

### *Recorded Payment of $2,000 on April 5, 2017*

20.     On or about April 5, 2017, CW-A met with agents from the FBI and HHS-OIG. The agents equipped CW-A with recording devices and advised CW-A to make a recorded kickback payment to GADDAM for four new patient referrals. Agents provided CW-A with $2,000 in U.S. currency, in $100 denominations, in an envelope with a yellow sticky note with GADDAM's name written on it. CW-A also had documents for GADDAM to sign at the meeting for the episodes of home health Company A was providing and a typed matrix listing the patients GADDAM had referred to Company A. CW-A then traveled to Hospital A to meet with GADDAM.

21.     During the meeting, CW-A and GADDAM discussed some of the patients GADDAM had referred to Company A and tallied the total number that CW-

A owed GADDAM. They are both heard counting on the audio portion of the recording, and agree that CW-A owes GADDAM for five patients. CW-A said, "Five, okay. But I only have four," which meant that CW-A only had money to cover the kickback for four of the patients, or $2,000. GADDAM said that was acceptable.

22.     A video device captured CW-A handing the envelope with the money to GADDAM. GADDAM also told CW-A to "put it underneath here [underneath the paperwork CW-A brought]... Normally they put this and that in the envelope so that (unintelligible). But that's ok. No problem." CW-A then asked GADDAM if in the future he wanted to receive "it" in a folder and GADDAM answered "Yeah. A folder like, in a yellow envelope. These papers and this [meaning the envelope of cash] go in there, so we won't even have to talk about it." GADDAM then gestured with the paperwork saying "go there, right there," indicating that the envelope of cash should be comingled with the paperwork CW-A would bring for him to sign.

23.     During the meeting, GADDAM identified another company he referred patients to ("Company D") and recalled he had been referring patients to them since 2009 or 2010. GADDAM also generally summarized the series of meetings between CW-A and GADDAM, corroborating the timeline CW-A earlier provided when interviewed by agents on or about March 21, 2017.

24.     CW-A also voiced worry over being caught, saying "I'm really concerned, you know." GADDAM then tried to reassure CW-A by saying "I know. But I have no problem since 1992, ever since I moved here. . . So I have no problem. I'm not on the radar or anything."

9

25. GADDAM also suggested to CW-A that they cycle his patients on and off home health saying "you [meaning Company A] recert once or twice, no more than that. And then we can let them [the patients] stay without anybody for two/three months and then bring them back, you know." In my training and experience, this is an indicator of fraud, as the decision to recertify, discharge, and readmit for home health is not based on any legitimate medical need, but instead out of a desire to increase billing and reimbursements. The decision to discharge and then readmit without a medical need also can be seen as an attempt avoid scrutiny from administrative authorities and law enforcement, as it is commonly thought that billing data is scrutinized for patients who have been continuously on home health for long periods of time.

26. During this meeting, CW-A and GADDAM also reviewed the typed kickback matrix that CW-A prepared, which listed GADDAM's referrals to Company A. CW-A asked if GADDAM wanted a copy and GADDAM responded, "Yeah. I usually get a copy." GADDAM also told CW-A that he would also fax a copy "from previous providers" to CW-A, stating "it's a start of care, and recert one, recert two, recert three. Like that."

***Recorded Payment of $3,000 on April 26, 2017***

27. On or about April 26, 2017, CW-A met with agents again to make a recorded kickback to GADDAM for six new patient referrals. CW-A was provided with recording devices and $3,000 in U.S. currency, all in $100 denominations, in an envelope with a pink sticky note with GADDAM's name written on it. CW-A then

traveled to Hospital A to meet with GADDAM. During this meeting, as set forth in the recording, CW-A and GADDAM discussed the total number of referrals GADDAM had sent to Company A. GADDAM and CW-A identified eight patients who had been referred and admitted to Company A for home health, and with a ninth patient only newly referred. CW-A told GADDAM that he "already prepared for six," meaning CW-A brought cash to cover six referrals, or $3,000, and GADDAM said, "that's alright." Company A paid for ten referrals, but had only actually received nine.

28. A video device captured CW-A passing the envelope containing the cash, with the pink sticky note, and GADDAM's name, visible in the frame.

29. CW-A reiterated his concern about being caught and GADDAM responded "this has been going since, uh, almost 20 years my friend. If you don't want to do it, whenever you want to back out you let me know. How's that? There are other agencies I can refer to" and he said he would respect CW-A's decision if CW-A chose to do so. GADDAM continued, "I want you to be [a] winner. I want to be [a] winner. And if you don't want that. I have to respect that."

30. GADDAM added a few minutes later, "Trust me. You work with me, we will both be winners" and told CW-A to ask Individual B, because GADDAM used to use her "exclusively." CW-A asked if GADDAM had the same kind of arrangement with Individual B and GADDAM answered "of course. Six [$600] for the first visit and five [$500] for the recerts. And in those days they used to recert three, four, five times because nobody paid attention." CW-A recalled that GADDAM traced the numbers "600" and "500" in the air while he spoke. However, the video devices did

not appear to capture the gestures. GADDAM also said that Individual B came to visit him frequently at his office in Hospital A during the time they were working together.

### *Recorded Payment of $2,600 on May 24, 2017*

31.     On or about May 10, 2017, CW-A received a text message from GADDAM where GADDAM informed CW-A that he had just referred a fourteenth patient to Company A and out of the thirteen he had already referred he had "signed" ten. GADDAM then asked when he could next meet with CW-A and offered a time frame of that day, a Wednesday, to Friday. CW-A responded that he was out of town and offered that they could meet the following week.

32.     On or about May 24, 2017, CW-A met with agents again to make a recorded kickback payment to GADDAM. Law enforcement initially provided CW-A with $2,700 in U.S. currency, in $100 denominations. Law enforcement placed $2,000 in an envelope with an orange sticky note affixed to the outside with GADDAM's name on it. The remaining $700 was given to CW-A to be kept in his pocket to cover the payment for two recertifications, which would be $600. CW-A was deliberately given an extra $100 by agents to make it appear less suspicious when he made the supplementary payment for the two recertifications. CW-A also had documents for GADDAM to sign and a typed list of patient names that GADDAM had referred to Company A. CW-A then traveled to Hospital A to meet with GADDAM.

33.     Near the beginning of the meeting, GADDAM told CW-A that he had already "signed" ten CMS-485s for Company A. CW-A responded "I don't know if you

signed ten." GADDAM answered, "No! What I mean is [whispering] taken care of them... that's what I'm saying. That's what I'm saying." CW-A interpreted this as GADDAM saying "signed" was his euphemism for having gotten paid for a patient referral.

34.     GADDAM asked CW-A about his travel schedule at his regular job and suggested to CW-A to "encourage your wife just to come and get the signatures. You know, she was afraid before. But she knows, like, I'm on (unintelligible) now. I'm onboard." CW-A responded by saying "we have to do this more, and then, you know, maybe she'll get comfortable... She doesn't want to get involved." GADDAM answered that he understood and later compared an unknown person to CW-A by saying "the wife of one of the Filipino agencies, she's a nurse too" and she visits GADDAM and "she leaves my envelope with the money ["money" said in a whisper] inside."

35.     While a video device did not capture CW-A handing GADDAM the envelope containing $2,000, CW-A can be heard in the audio portion on a different device telling GADDAM, "I only have 2,000 there. For four." GADDAM answered by saying "Ok, that's fine. No problem," and then directed CW-A to "write down we did fourteen... signed fourteen 485s" on the typed list CW-A brought to the meeting.

36.     CW-A and GADDAM discussed GADDAM's total referrals to Company A, which totaled 17 patients, but three were not admitted for various reasons. That left the total at 14 new patient admissions, which together with the previous recorded payments, meant that as of the payment on May 24, 2017, Company A had paid GADDAM for the all the new patient referrals he had provided.

37.     CW-A and GADDAM also discussed how two patients were being recertified. CW-A told GADDAM he had "two recerts already" and GADDAM answered "recerts, we are not taking care of that now, right?" CW-A soon after said "I do have some money doc, for like…" GADDAM answered "You want to finish? Up to date? How many recerts do you have? Two?" CW-A and GADDAM then reviewed CW-A's list and GADDAM said "we can take care of it now."

38.     GADDAM also told CW-A "remember, I gave you [a] discount, until you feel comfortable." CW-A asked "how much was that?" And GADDAM responded "how much do you remember? I charge the other guys five [meaning $500]." CW-A offered "200?" And GADDAM made an audible noise and exclaimed, "No!" GADDAM continued, "you can give me three [meaning $300], that's fine." CW-A responded, "I remember. I'm just kidding." GADDAM then commented, "the other guys, because I've been doing business for a long time" and then counts audibly "one, two, three, four, five" and CW-A says "six."

39.     The audio portion captured the crinkling of bills during this exchange but the video devices did not capture the images of the bills as they changed hands. CW-A reported after the meeting with GADDAM that he had given GADDAM both the envelope with the cash and the $600 in loose cash. CW-A's person and vehicle were searched before, with any U.S. currency inventoried, and after, and CW-A was surveilled during his drive to and from Hospital A. CW-A returned a single $100 bill after the recording and no additional $100 bills were identified in CW-A's possession after the meeting with GADDAM.

14

### *Recorded Payment of $1,700 on June 14, 2017*

40.     CW-A and GADDAM had arranged to meet at a suburban restaurant on or about June 5, 2017, before GADDAM left for a trip, in order for CW-A to pay GADDAM for patient referrals. GADDAM notified CW-A that morning, via text message, that he could not make it and offered to either meet the following day at Hospital A, or the week of June 12, 2017.

41.     On or about June 13, 2017, CW-A and GADDAM arranged a meeting for CW-A to pay GADDAM for patient referrals. GADDAM sent CW-A a text message and offered to meet CW-A in Darien, Illinois, either that day before 11:00am or at Hospital A the following day. CW-A asked to meet on June 14, 2017, in the morning at a fast food restaurant near GADDAM's home and GADDAM agreed. In the morning of June 14, 2017, GADDAM sent CW-A another text message and asked if CW-A could meet at an earlier time. CW-A agreed.

42.     That same morning, CW-A met with agents to make recorded kickback payment to GADDAM. Law Enforcement provided CW-A with recording devices and $1,200 in a bank envelope, which CW-A had written GADDAM's name on, and an additional $500 to keep in his pocket to pay for a new patient referral. CW-A then met with GADDAM at the fast food restaurant.

43.     During this recorded meeting, CW-A and GADDAM reviewed a tracking matrix created by CW-A. CW-A provided GADDAM a copy. GADDAM was visible on camera taking notes on his copy, and appeared to be making calculations on the paper. GADDAM provided CW-A with three typed kickback matrices which he

claimed had been created by another home health company to track similar activity.[3] GADDAM told CW-A that he preferred their version to CW-A's, because the other company's kickback matrix was easier for GADDAM to read. GADDAM told CW-A the three documents he gave CW-A were from 2016, and one of them bears a handwritten note "Signed 8/12/16" on it. GADDAM can also be heard saying on the video that the red text on these kickback matrices was for an episode "I did not sign." GADDAM communicated to CW-A during their meeting on or about May 24, 2017, that "signing" was his euphemism for collecting his kickback payment. A review of Medicare data for GADDAM revealed that the patients listed on the kickback matrices GADDAM gave to CW-A were patients of Company G, another home health agency to which GADDAM referred patients.

44.     GADDAM showed CW-A another tracking tool from Company D, another home health agency to which GADDAM referred patients. GADDAM stated that he recertified 26 patients for Company D and referred them nine additional patients in May [2017]. This tracking tool, visible on the video recording, was a typed matrix listing what appeared to be patient names in the first column and dates in the second column.

45.     CW-A mused that he wanted to know why GADDAM was so loyal to Company D. GADDAM replied, "you want to know something? With him, six and five

---

[3] Based upon my training and experience, and the training and experience of other agents with whom I have consulted, I am aware of individuals involved in either the payment or receipt of kickback payments who maintained records used to track the kickback payments.   For the purposes of this Affidavit, I will refer to the payment tracking records as "kickback matrices."

[GADDAM's fingers are visible tracing numbers on the table]. Six for start of care. Five [Company D paid him $600 per new patient and $500 per recertification]." GADDAM continued by saying he only recently gave Company D "a discount" because the spouse of Company D's owner lost her job.

46.     GADDAM accepted the bank envelope containing $1,200 from CW-A and put it in his sport coat pocket. CW-A can be heard telling GADDAM, "uh, that's like only for this though" and can be seen gesturing to the kickback matrix. CW-A then offered to pay for a new patient referral and GADDAM asked, "you have five?" CW-A passed $500 in loose bills to GADDAM, who appeared to put the cash in his clothing.

47.     GADDAM stacked CW-A's kickback matrix beneath the stack of documents containing Company D's matrix, other documents, and a large manila folder.  GADDAM then walked out of the fast food restaurant. An agent observed GADDAM carrying documents and a manila folder to his car, which was parked near the fast food restaurant where GADDAM'S meeting with CW-A took place. GADDAM entered the vehicle with the documents in hand and drove away. Another agent observed GADDAM pull into a driveway of a residence located at 7205 Bentley Avenue Darien, Illinois, 60561, exit his vehicle carrying documents, and then enter the residence.

### Medicare Data

48.     On or about April 10, 2017, law enforcement conducted a review of available Medicare records for GADDAM, with a focus on GADDAM's home health

referrals and certifications. The available records only went back to the beginning of 2006, so the period of review was roughly January 1, 2006, to April 10, 2017. During this period, Medicare records indicate that GADDAM certified approximately 5,051 episodes of home health for 464 total patients. Medicare paid out roughly $11,527,518 to 32 different home health agencies for these services.

49. Of these 32 total companies, only eight received more than ten unique patients from GADDAM during the period in question. These eight companies accounted for approximately 4,989 episodes of home health, or roughly 98.7% of all of the episodes of home health that GADDAM certified during the period reviewed. Summary information about these companies, organized from highest paid downward, is outlined in the table below:

| Agency | Unique Pts. | Episodes | Approximate Date Range | Paid Amount |
|--------|-------------|----------|------------------------|-------------|
| Company D | 207 | 2,031 | March 2011 to February 2017 | $4,354,859 |
| Company E | 231 | 1,253 | January 2006 to May 2010 | $3,237,505 |
| Company B | 196 | 817 | March 2008 to March 2014 | $1,829,238 |
| Company F | 132 | 418 | May 2006 to February 2011 | $929,455 |
| Company G | 71 | 277 | May 2014 to January 2017 | $620,134 |
| Company H | 32 | 78 | June 2014 to August 2015 | $194,774 |
| Company C | 30 | 69 | September 2013 to March 2015 | $166,688 |
| Company I | 33 | 46 | January 2006 to July 2006 | $61,882 |

## CONCLUSION

50.    Based on the above information, I respectfully submit there is probable cause to believe that Dr. DEENADAYAL GADDAM solicited and received illegal kickback payments in exchange for Medicare patient referrals, in violation of U.SC. § 1320a-7b(1)(A).

FURTHER AFFIANT SAYETH NOT.

Elliot Rothrock
Special    Agent,    Federal    Bureau    of
Investigation

SUBSCRIBED AND SWORN to before me on June 21, 2017.

Daniel G. Martin
United States Magistrate Judge